MÉNDEZ, DEMANDANTE Y APELADA, v. MARTÍNEZ, DEMANDADO Y APELANTE.

APELACIÓN procedente de la Corte de Distrito de Aguadilla en pleito sobre reconocimiento de hijos naturales.

No. 1415.—Resuelto en junio 24, 1916.

Resuelto en reconsideración en julio 21, 1916.

NUEVO JUICIO—PRESENTACIÓN DE LAS PRUEBAS.—Cuando revocada una sentencia por el Tribunal Supremo el caso se devuelve para la celebración de un nuevo juicio en términos generales, a falta de indicación específica en contrario en ella, las partes no están más limitadas en la presentación de su prueba que lo que estarían en una apelación procedente de una corte municipal o si desistieran de su caso y lo empezaran de nuevo.

ID.—HECHOS ADICIONALES O EXPLICATIVOS—RES JUDICATA.—Es un error suponer que en un nuevo juicio es necesario justificar, antes de que depongan testigos del primer juicio, en qué forma o manera se diferenciaría la prueba que iba a presentarse de los hechos tal como fueron referidos en la vista anterior, o que solamente puede ofrecerse nueva prueba o prueba descubierta nuevamente, y que en el segundo juicio únicamente deben permitirse hechos adicionales o explicativos de los anteriores. Los hechos del primer juicio nunca constituyen res judicata en el nuevo juicio.

ID.—FRAUDE O FALSEDAD—VERACIDAD DE LOS TESTIGOS.—A falta de verdaderos indicios de fraude o falsedad, el mero hecho de que las declaraciones de unos testigos se diferencien en parte de las prestadas en el primer juicio y de que la teoría de la corte sentenciadora fuera otra, no puede deducirse que los testigos no estén diciendo la verdad. En caso de existir alguna diferencia substancial, una parte tiene derecho al beneficio de la verdad.

EXPOSICIÓN DEL CASO—NOTAS DEL TAQUÍGRAFO—DECLARACIONES DE TESTIGOS EN ELLAS CONTENIDAS.—Son inadmisibles como prueba las declaraciones de testigos en un juicio anterior contenidas en una exposición del caso o récord taquigráfico si los testigos mismos pueden producirse.

TESTIGOS—FORMA DE CONTRADECIRLOS—NUEVO JUICIO.—La forma adecuada de contradecir a un testigo sobre manifestaciones hechas en un segundo juicio se determina en los artículos 156 y 157 de la Ley de Evidencia. Los testigos deben estar declarando, llamárseles la atención de sus manifestaciones contrarias y deben tener la oportunidad de explicarlas.

ID.—PREGUNTAS SOBRE CUESTIONES COLATERALES—MANIFESTACIONES FALSAS.—Si a un testigo se le pregunta acerca de una cuestión colateral que no tiene relación con los hechos del juicio, generalmente es inadmisible la prueba para acreditar que hizo una manifestación falsa, por la razón de que si tales investigaciones colaterales fueran permitidas nunca podría terminarse el juicio.

NACIMIENTO—REGISTRO CIVIL—FACULTADES DEL ENCARGADO DEL REGISTRO.—El encargado de un registro civil carece de facultades para hacer la inscripción del nacimiento de un niño fuera del término concedido por la ley. Por lo general, cuando se confía en la presentación de un récord para evitar la

necesidad de tener que presentar otra prueba, debe probarse que el récord está estrictamente comprendido en los requisitos de la ley.

HIJOS NATURALES—RECONOCIMIENTOS—PRUEBA DE CARTAS ESCRITAS ANTES DEL PERÍODO DE LA CUESTIÓN ENVUELTA.—La admisión indebida de cartas fuera de las fechas comprendidas en las alegaciones, en una demanda sobre reconocimiento de hijos naturales, de las relaciones entre la madre y el supuesto padre natural no es perjudicial al demandado cuando otras cartas han sido debidamente admitidas dentro de esas fechas, a menos que el demandado pruebe que las cartas escritas antes eran de naturaleza muy distinta a las escritas dentro del período preciso de la cuestión envuelta.

ID.—RECONOCIMIENTO—DECLARACIÓN EN INTERÉS PROPIO.—En casos sobre reconocimiento de hijos naturales es inadmisible una carta escrita por el supuesto padre natural a su esposa manifestándole que el demandado era su único hijo porque sería una declaración en su propio interés (*self-serving declaration*) y no tendría fuerza probatoria alguna. (Véase también la opinión en reconsideración.)

NON-SUIT—SUFICIENCIA DE LA PRUEBA—PRUEBA DEL DEMANDADO—RENUNCIA.— Una moción de *non-suit* necesariamente tiene que hacerse al peso de la prueba y cuando el demandado sigue adelante y presenta su prueba, renuncia a dicha moción.

DEFUNCIÓN—EDAD.—No comete error una corte que se niega a admitir una certificación de defunción presentada con objeto de probar la edad de la persona fallecida.

CONCUBINATO—MATRIMONIO—RESIDENCIA.—No es un elemento necesario de un estado de concubinato que el hombre tenga una residencia más o menos exclusiva con la mujer ni es necesario para que exista el estado de concubinato que el hombre no deba tener otra residencia que la de la mujer, pues semejante condición no es indispensable en un estado de matrimonio, ni para un estado de concubinato.

ID.—VISITAS SEMANALES—PERMANENCIA EN LA CASA—DERECHOS DE LOS HIJOS— RECONOCIMIENTO.—Cuando un hombre sostiene una casa separada para una mujer por un período de años y va a visitarla semanalmente permaneciendo días en ella, semejantes relaciones constituyen un estado de concubinato, y el derecho del hijo nace de este estado de concubinato y no de actos de reconocimiento voluntario del padre. (Véase también opinión en reconsideración.)

Los hechos están expresados en la opinión.

El apelante compareció en nombre propio.

Abogado de la apelada: *Sr. José de Guzmán Benítez.*

EL JUEZ ASOCIADO SR. WOLF, emitió la opinión del tribunal.

En 3 de julio de 1913, la Corte de Distrito de Aguadilla dictó una sentencia a favor de los demandantes en esta acción. Esta fué revocada en apelación, debido principalmente a que la prueba era insuficiente, por exigir prueba robusta un caso

de filiación. *Méndez* v. *Martínez,* 21 D. P. R. 252. El caso
fué devuelto para la celebración de un nuevo juicio y la corte
dictó otra vez sentencia a favor de los demandantes. Con-
tra esta segunda sentencia Víctor Martínez ha interpuesto
nuevamente recurso de apelación.

Un número de los errores alegados se debió a la situación
que el apelante consideró fué producida por los hechos desa-
rrollados en el primer juicio.

La tercera excepción presentada por el apelante es de
este carácter. Los demandantes propusieron como prueba
las declaraciones de Cecilia Méndez, Sixta Torres e Irene
Hernández, todas las cuales habían declarado en el primer
juicio. Al ser llamadas a la silla testifical y antes de que
se les hiciera ninguna pregunta, el apelante se opuso a la
declaración de estos testigos, fundándose en que era nece-
sario justificar primero en qué forma o manera se diferen-
ciaría la prueba que iba a presentarse de los hechos refe-
ridos en el primer juicio. El parece tener la idea de que
al ser devuelto un caso para la celebración de un nuevo jui-
cio los hechos del primer juicio son una especie de *res adju-
dicata,* y que solamente podía ofrecerse nueva prueba, o
prueba descubierta nuevamente; y que en el segundo juicio
únicamente deben permitirse hechos adicionales o explica-
tivos de los anteriores. No discutiremos todos los concep-
tos erróneos del apelante. Es bastante con decir que cuando
un caso ha sido devuelto para la celebración de un nuevo
juicio en términos generales para permitir que se aclaren
todas las cuestiones principales, como se hizo en este caso,
el caso es un juicio *de novo* y las partes no están más limi-
tadas en la presentación de su prueba que lo que estarían
en una apelación procedente de una corte municipal, o si
desistieran de su caso y lo empezaran de nuevo. En cier-
tas ocasiones, cuando este tribunal revoca por falta de ele-
mentos de prueba, o para que se rinda una cuenta, el orden
que ha de observarse por la corte inferior lo indica nuestra
sentencia. Sin embargo, a falta de una indicación especí-

fica en sentido contrario, el ordenar la celebración de un nuevo juicio deja a las partes en libertad para empezar de nuevo, sin más traba, o impedimento que no sea el de que a los testigos se les ponga de manifiesto cualesquiera declaraciones contradictorias que hayan prestado en el juicio anterior. Los principios que regulan las mociones de nuevo juicio basadas en el descubrimiento de nuevas pruebas no tienen aplicación a un caso que ha sido revocado por errores cometidos en la admisión o denegación de prueba, o por la falta de prueba suficiente, o cosa semejante. *Donahue* v. *Klassner,* 22 Mich. 252; *Atchison* v. *Owen,* 58 Tex. 610; *Jones* v. *Andreys,* 72 Tex. 5; 29 Cyc. 1043–44. Es de alguna aplicación la decisión de este tribunal en el caso de *Carmona* v. *Cuesta,* 23 D. P. R. 685.

La cuarta excepción del apelante se basó en la misma errónea teoría. De igual naturaleza son una o más de las razones alegadas en una moción de *non suit,* a cuya negativa se refiere la quinta excepción.

La corte se negó a admitir como prueba la exposición del caso del primer juicio, y a esta negativa hace referencia la séptima excepción. El ofrecimiento de esta exposición del caso como prueba independiente no se ajusta a ninguna de las formas reconocidas por la ley cuando los testigos mismos viven y pueden ser traídos a la corte. La regla es que deben presentarse los testigos mismos y las excepciones se fundan en la ausencia o incapacidad de dichos testigos para declarar.

En tanto este ofrecimiento como prueba de las declaraciones prestadas en el juicio anterior fué una tentativa para contradecir las manifestaciones hechas por los testigos en el segundo juicio, tal vez es bastante con decir que la forma adecuada de contradecir a un testigo es la que determinan los artículos 156 y 157 de la Ley de Evidencia. Los testigos deben estar declarando, llamárseles la atención a sus manifestaciones contradictorias, y deben tener la oportunidad de explicarlas. En otra de las excepciones que presenta

el apelante en el señalamiento de error relativo a la admisión en evidencia de las cartas del padre del apelante, también tenía el apelante la idea de que podía atacar dicha admisibilidad mediante la presentación de los hechos del primer juicio.

El apelante ofreció como prueba el récord taquigráfico de la primera apelación para impugnar a ciertos testigos, prueba que fué desestimada por la corte, y éste fué el punto objeto de la excepción novena.  Aunque este supuesto error se discute extensamente en los alegatos de las partes, parece suficiente con decir que no se puso de manifiesto a los testigos que se trató de impugnar sus declaraciones contradictorias, ni se les dió oportunidad de explicarlas, y la excepción queda refutada por los principios de los artículos 156, 157 y 158 de la Ley de Evidencia, *supra.*

La demandante para probar el nacimiento de los demandantes ofreció dos certificaciones expedidas por el encargado del Registro Civil de San Sebastián.  En una de estas certificaciones se hace comparecer a Cecilia Méndez y decir que había tenido un niño unos veinte y nueve días antes.  La ley parece exigir que dicha comparecencia debe hacerse dentro de veinte días, si bien el apelante dice que el término es de ocho días.  No importa el período preciso puesto que la comparecencia de Cecilia Méndez estaba fuera de uno u otro período y, por tanto, el encargado del registro carecía de facultades para hacer la inscripción.  Nos inclinamos a creer que la admisión de esta certificación constituyó un error.  Por lo general cuando se confía en la presentación de un récord para evitar la necesidad de tener que presentar otra prueba, debe probarse que el récord está estrictamente comprendido en los requisitos de la ley.  Se le hizo la objeción a la otra certificación de que a falta de explicación del hecho de no haber comparecido uno de los padres la comadrona no tenía derecho a comparecer.  Creemos asimismo que la objeción formulada a la segunda certificación fué válida.  Sin embargo, los errores en la admisión de esta prueba no eran

perjudiciales en manera alguna. Apenas hubo dudas de que estos niños eran los hijos de Cecilia Méndez. En una acción establecida por estos niños contra su madre para reclamar su filiación la prueba podría haber tenido más importancia, pero en el caso de autos no existió verdadera cuestión acerca del hecho de que los demandantes eran los hijos de Cecilia Méndez y nacieron en las fechas indicadas. La relación de estos niños con Cecilia Méndez quedó suficientemente probada por su misma declaración, la de sus otros hijos, la comadrona que la asistió en su alumbramiento, y por otros testigos.

La excepción segunda hace referencia a la admisión por la corte de numerosas cartas que se dice fueron escritas por Víctor Martínez a Cecilia Méndez. Parte del razonamiento se dirige a la falta de autenticidad de las mismas. Hubo prueba suficiente tendente a mostrar que estas cartas fueron escritas y enviadas por el padre del apelante. Sin embargo, el argumento en su mayor parte se refiere al peso de la prueba y debe ser discutido al tratarse de la suficiencia de la prueba para sostener la sentencia. Sería una objeción decir que estas cartas se referían a un período que está fuera de las cuestiones envueltas en este caso. La teoría del apelante en cuanto al particular, es que la demanda hace referencia solamente al período existente entre la concepción de los niños y la muerte del padre natural, o sea, desde 1908 a 1912; pero la teoría que sustenta la demanda es, que las relaciones entre Víctor Martínez y Martínez y Cecilia Méndez existieron durante un número de años; por tanto era pertinente y esencial, sino necesario, para los demandantes el probar un estado constante de concubinato que tal vez se extiende a más allá de una época anterior al de la concepción de los demandantes. Aun cuando las relaciones fueran interrumpidas, la admisión de varias cartas fuera de las fechas comprendidas en las alegaciones de este caso no sería perjudicial en vista de las numerosas cartas que son debidamente admisibles dentro de estas fechas, a menos que el

apelante pudiera probar que las cartas no comprendidas en el período eran de naturaleza muy distinta a las cartas escritas durante el período preciso de las cuestiones envueltas en este caso. Como ya hemos indicado estas objeciones afectan más bien al peso de la prueba. Algunas de las otras objeciones formuladas a estas cartas ya han sido consideradas por esta corte en otro lugar.

Al terminarse la prueba de la demandante el demandado presentó una moción de *non suit*. Una moción de *non suit* necesariamente tiene que hacerse al peso de la prueba. Algunas de las cuestiones levantadas en esta moción de *non suit* ya las hemos discutido y es bastante con decir en lo que respecta a mociones de *non suit* en general, que cuando un demandado sigue adelante y presenta su prueba, renuncia a dicha moción. *Rivera* v. *Díaz,* 19 D. P. R. 548; *Príncipe* v. *The American R. R. Co,* 22 D. P. R. 302. Esta corte, por tanto, solamente considerará la prueba en conjunto para ver si los hechos sostienen la sentencia.

Se queja el apelante de la negativa de la corte a admitir una certificación de defunción para probar la edad de su padre. La corte admitió la certificación para acreditar el fallecimiento, pero la rechazó como creditiva de la edad y no vemos ningún error en su resolución.

La excepción octava se refiere a la negativa de la corte a admitir dos certificaciones de la corte municipal creditivas de que Joaquín Oronoz había radicado dos denuncias contra el apelante por supuestos delitos, de los cuales fué absuelto el apelante. Estas certificaciones no tendían a demostrar que Joaquín Oronoz tenía algún interés en esta acción, y el hecho de que el testigo dijera que solamente había presentado una denuncia contra el demandado era una manifestación colateral a las cuestiones del caso. Si al testigo se le pregunta acerca de una cuestión colateral que no tiene relación con los hechos del juicio, generalmente es inadmisible la prueba para acreditar que hizo una manifestación falsa, por la razón de que si tales investigaciones colatera-

les fueran permitidas nunca podría terminarse el juicio, Wigmore on Evidence, pár. 1001 y siguientes, 40 Cyc. 2569, y siguientes. Secs. 156, 157 y 158 de la Ley de Evidencia. La prueba, además, tendía a demostrar de todos modos que la supuesta manifestación falsa no se hizo corruptamente.

La excepción décima se refirió a la negativa de la corte en admitir una carta escrita por Víctor Martínez, padre, a su esposa, en la que le manifestó que Víctor P. Martínez era su único hijo legítimo. Esta carta fué a manera de una declaración en su propio interés (*self-serving*). Era *res inter alios acta* y no se probó ninguna razón para su admisión. No vemos ningún error y la carta prácticamente no tendría fuerza probatoria alguna. Sin la solemnidad de un juramento una carta escrita por un hombre a su esposa en la que le dice que no tiene otro hijo que su hijo legítimo, aun cuando fuera prueba competente sería todavía menos convincente o probatoria que la manifestación hecha por un hombre de que una propiedad era suya exclusivamente y no ganancial. Esto resuelve todas las demás excepciones presentadas en los autos.

El apelante discute en su alegato la insuficiencia así de la demanda como de la sentencia. Creemos que la demanda determina suficientemente que en la época de la concepción y nacimiento de cada uno de los demandantes en este caso, Víctor Martínez y Cecilia Méndez vivían juntos en estado de concubinato, habiendo sostenido relaciones amorosas, y que en la fecha de la concepción de los niños no existía impedimento alguno para el matrimonio de los padres. Alega también la demanda hechos que tienden a demostrar que Víctor Martínez siempre había considerado a los niños como suyos propios y como tales los había llamado en distintas ocasiones, y que Víctor Martínez estaba muerto. En la demanda entre otras cosas se pide que sean declarados los niños hijos naturales de Víctor Martínez, con derecho a llevar su apellido y demás derechos que les otorga el Código Civil; y la sentencia en este caso se ajustó suficientemente

a las alegaciones de la demanda. No es una crítica de la sentencia que en ella se declararon los derechos civiles que tenían los niños en la herencia de su padre.

Las cuestiones realmente importantes que han de ser consideradas en este caso son si la prueba fué bastante fuerte para justificar la sentencia de la corte, y también si dicha prueba confirió a los niños un estado legal.

Al revocar la sentencia en la primera apelación este tribunal se apartó de su práctica general de dictar la sentencia que debió haber dictado la corte inferior, pues parecía probable que los demandantes dejaron de presentar toda la prueba de que disponían. Esta corte resolvió que los actos de Víctor Martínez en prodigar cariños a sus supuestos hijos y en llamarles a veces como hijos suyos, no era la prueba robusta que la ley requería y eran medios algo dudosos de demostrar la intención del padre de reconocer a sus hijos. También declaramos que las cartas ofrecidas en evidencia en aquel caso no fueron identificadas suficientemente, ni se demostró que comprendían el período inmediatamente anterior y posterior al nacimiento de los demandantes en esta acción. La teoría sostenida por las partes en el anterior juicio era que los supuestos padres de estos niños habían tenido relaciones solamente por cuatro o cinco años, y por tanto, que como las cartas comprendían un período anterior a eso no tendrían fuerza probatoria para acreditar una relación existente después de terminada la correspondencia. No hubo prueba de que ninguna de estas cartas se refiriera al período de la concepción y nacimiento de los demandantes en este caso. También resolvió la corte que las manifestaciones hechas por los testigos en cuanto al sostenimiento de Cecilia Méndez y sus hijos por Víctor Martínez fueron vagas, no convincentes y hasta contradictorias.

En el segundo juicio Cecilia Méndez subió a la silla de testigos y declaró que tuvo relaciones con Víctor Martínez por espacio de veintitrés años; que Víctor Martínez durante todo el período iba generalmente a su casa como una vez

a la semana y permanecía allí tres o cuatro días; que durante estos tres o cuatro días que estaba con ella llevaba la vida que observa cualquier hombre con su mujer e hijos; que se cuidaba de ella y la sostenía, así como a todos los hijos; que le enviaba ocho dólares semanales; que todo lo que había adquirido procedía de él; que atendió a su sostenimiento en diferentes lugares y la ayudó a sostener y a atender a estos sitios; que sus relaciones con ella continuaron hasta después de la fecha del nacimiento de Pedro Angel y Laura María, demandantes en este caso; que a la fecha del juicio uno de estos niños tenía cinco años de edad y el otro tres; y de esta manera comprobó ella que el nacimiento de los niños fué en la fecha mencionada en la demanda, o sea, en noviembre 22, 1909, y noviembre 4, 1911; que ella sabía que Víctor Martínez era casado y tenía una casa en otro sitio, a veces en San Sebastián y otras en Mayagüez. Hizo otras manifiestaciones tendentes a demostrar que durante todo el período de veintitrés años Víctor Martínez venía a visitarla periódicamente y hacía un vida marital con ella por tres o cuatro días en cada una de sus visitas. Hubo prueba que no fué refutada en este caso de que Víctor Martínez y Martínez tenía una casa independiente donde vivió con su esposa y que su único hijo legítimo era el demandado.

Cecilia Méndez es la persona que naturalmente tendría conocimiento de todos los hechos de este caso. Su declaración ha sido impugnada por tener interés en el asunto, y como cuestión general sería peligroso para cualquier corte de primera instancia recibir las manifestaciones no corroboradas de una mujer en sus condiciones, pero en este caso la declaración de Cecilia Méndez fué fuertemente corroborada. Estuvo corroborada por sus demás hijos, con respecto a los cuales también hubo prueba de que eran los hijos de Víctor Martínez; fué corroborada por testigos que estuvieron presentes en la fecha del nacimiento de sus dos últimos hijos; por testigos que declararon respecto al conocimiento que tenían de las relaciones que por largo tiempo existieron entre

Víctor Martínez y Cecilia; por testigos que llevaban cartas y dinero a ella; y, finalmente para no mencionar todas las circunstancias, por las mismas cartas.

Hemos examinado las firmas que aparecen en estas cartas. Tiene razón el apelante al sostener que la firma de las cartas difiere de la firma puesta en los documentos indubitados. Los documentos legales eran de fecha un poco anterior a las fechas de las primeras cartas. Creemos, sin embargo, que el carácter general de las firmas es igual. Cada una de las letras o caracteres que constituyen las firmas de la correspondencia no se diferencian más de las letras en los documentos indubitados que lo que se diferencian de cada una de las letras en el cuerpo principal de la correspondencia. En algunas de las cartas admitidas como prueba la "M" de Martínez se diferencia de la "M" del cuerpo principal de la comunicación. Las cartas presentadas en este juicio fueron identificadas por varios testigos, por las personas que las llevaron, y por los miembros de la familia de Cecilia Méndez que las habían visto o recibido. El contenido de estas cartas tendía a demostrar una relación continua entre Víctor Martínez y Cecilia Méndez. Una de estas cartas fué escrita por uno de los hijos de Cecilia Méndez a su madre cuando él se encontraba con su supuesto padre natural y el padre natural agrega algunas líneas a las palabras del muchacho. Esta carta fué impugnada porque estaba firmada "Pascasio" cuando el nombre del muchacho era "Francisco," pero creemos que hubo prueba suficiente de que al muchacho se le llamaba por ambos nombres. Ahora bien, aunque no se ha probado claramente que estas cartas comprendan el período en que nacieron los demandantes, sin embargo, toda la prueba tiende a acreditar que las relaciones que existieron durante todo ese período de las cartas, continuaron existiendo después, y que el estado o condición, si así puede llamarse, que existía entre Víctor Martínez y Cecilia Méndez continuó durante la concepción y nacimiento de Pedro Angel y Laura María.

El caso presentado en el segundo juicio era muy diferente del deficiente caso que fué presentado en el primer juicio. A falta de verdaderos indicios de fraude o falsedad del mero hecho de que las declaraciones de los testigos se diferenciaran en parte de las prestadas en el primer juicio y de que la primera teoría de la corte sentenciadora fué algo cambiada no puede deducirse que los testigos no estaban diciendo la verdad. Si existió alguna diferencia sustancial en las declaraciones, los demandantes tenían derecho al beneficio de la verdad y la corte estaba obligada a apreciarla.

Los autos no muestran cuál fué el fundamento que tuvo la corte inferior para llegar a la conclusión de que estos demandantes tenían derecho a que se hiciera el reconocimiento. Nos inclinaríamos a dudar si hubo prueba suficiente de que Víctor Martínez y Martínez reconoció en verdad a estos dos hijos como suyos. Hubo prueba, desde luego, tendente a demostrar eso, pero dudamos si debemos estar satisfechos con esa prueba solamente. Hemos dejado de decir que la esposa de Víctor Martínez falleció en 1908, y por consiguiente que a partir de esa fecha no hubo impedimento para el matrimonio de Víctor Martínez con Cecilia Méndez. El derecho de estos niños a ser llamados hijos naturales reconocidos depende, entre otras cosas, de la capacidad de sus padres para contraer matrimonio. Podríamos tener alguna ligera duda respecto a si Víctor Martínez llevó una vida familiar en lo concerniente a estos niños en particular, pues las cartas no comprenden el período que empieza con la concepción de los niños, pero esa duda está envuelta en lo que consideramos que es la cuestión principal en este caso, o sea, si los actos de Víctor Martínez con Cecilia Méndez constituyeron un estado de concubinato suficientemente conocido de otros. El párrafo 3°. del artículo 189 del Código Civil Revisado, con anterioridad a la enmienda de marzo 9, 1911, disponía que el padre estaba obligado a reconocer al hijo ilegítimo cuando la madre fué conocida viviendo en concu-

binato al tiempo del embarazo o nacimiento del hijo, o cuando éste haya nacido llevando sus padres relaciones amorosas.

Y el artículo 193 del Código Civil, como ha sido enmendado por la ley No. 73 de marzo 9, 1911, dispone que el padre está obligado a reconocer al hijo natural "cuando la madre fué conocida viviendo en concubinato con el padre durante el embarazo y al tiempo del nacimiento del hijo."

Se levanta cierta cuestión respecto al hecho de que Pedro Angel nació antes de marzo 9, 1911, y Laura María después. Sin embargo, de la única manera que estaríamos satisfechos en confirmar la sentencia en este caso es por la teoría de que los hechos mostraron el estado de concubinato descrito en el artículo 3 de cada una de estas leyes. No daremos importancia a esta consideración de si ese concubinato era conocido. Creemos que la prueba muestra que las relaciones entre Víctor Martínez y Cecilia Méndez eran suficientemente conocidas en San Sebastián donde el hombre y la mujer fueron vistos viviendo juntos.

Escriche en el Tomo II, página 453, define la concubina como la mujer que vive y cohabita con un hombre como si fuera su marido, siendo ambos libres y solteros y pudiendo contraer matrimonio, aunque el hombre en realidad pueda no ser su marido; y Gregorio López, el comentarista a las Leyes de Partida, se expresa en sentido parecido.

El artículo 452 del Código Penal que antes regía en Puerto Rico castiga al marido que tuviere una manceba dentro de la casa conyugal o fuera de ella con escándalo. Estas citas por sí indican que no es un elemento necesario de un estado de concubinato que el hombre tenga que tener una residencia más o menos exclusiva con la mujer. No creemos que es necesario para que exista un estado de concubinato que el hombre no deba tener otra residencia que la de la mujer. Como dijo la Corte Suprema de Louisiana, semejante condición no es indispensable en un estado de matrimonio ni lo era para un estado de concubinato. *Succession of Jahraus, infra.* La Enciclopedia Jurídica Española tiene un

corto artículo sobre el concubinato en donde se dice que para que constituya concubinato la unión que existe entre un hombre y una mujer debe ser duradera, continua y persistente.

Louisiana que también indirectamente hereda su ley de Roma, tenía también un precepto legal semejante al artículo 452 del Código Penal para España y Cuba, según el cual es un delito por parte del marido tener una concubina en la casa conyugal, o en algún otro sitio, notoria y públicamente. El estatuto ha sido citado en el caso de *Ledoux* v. *Her Husband*, 10 La. Ann. 663.

El artículo 1481 del Código Civil de Louisiana dispone que aquellos que han vivido juntos en notorio concubinato son incapaces para hacerse donaciones de bienes inmuebles.

En el caso de Sucesión de Jahraus, 114 La. 456, un hombre casado sostenía a una mujer secretamente y la corte, por tanto, resolvió que el artículo 1481 no era de aplicación, pero en el curso de la opinión la corte se expresó en estos términos:

"El demandado niega que jamás han existido relaciones ilícitas entre él y la testadora, y que en caso de que la corte resuelva que tales relaciones realmente existieron, él niega que fueran de la naturaleza que se les atribuye, o, en otras palabras, que constituyeran el hecho de 'vivir juntos en notorio concubinato,' de donde resulta la incapacidad que determina el artículo 1481.

&ast;    &ast;    &ast;    &ast;    &ast;    &ast;    &ast;

"Los ilustrados abogados del demandado fundan el argumento en las palabras 'haber vivido juntos.' Palabras que dicen deben ser tomadas en su sentido ordinario en la interpretación de un estatuto; y el sentido corriente de las palabras 'haber vivido juntos' es 'haber morado o residido juntos'; y por tanto los concubinos deben haber vivido juntos en el sentido de haber morado o residido juntos para que pueda ser aplicable a ellos el artículo 1481.

"No podemos adoptar esa interpretación. El residir juntos con frecuencia acompaña al concubinato, pero no es una característica esencial. Puede haber concubinato, un concubinato público a la vez, o sin eso, lo mismo que puede haber matrimonio sin ello. Es cosa que acompaña de modo invariable al matrimonio pero que no es esencial; su falta no anularía el matrimonio. No creemos que deba

decirse que la ley no tendrá en cuenta un concubinato en tanto se abstengan los concubinos de vivir realmente juntos. El objeto de la ley es la relación permanente de vivir juntos como hombre y mujer sin ser casados, y si esa relación se sostiene públicamente queda cumplida la condición del artículo 1481, aunque las partes no vivan juntas. Según la interpretación alegada un hombre podría poner una casa a una mujer, visitarla allí regularmente, crear una familia con ella, pagar sus cuentas, educar a sus hijos y de palabra o por su conducta, o en ambas formas, dar a conocer sus relaciones ilícitas con ella y, sin embargo, no estar comprendido el caso dentro de las prescripciones del artículo 1481, en tanto residiera en otra parte. Repetimos que no creemos que sería procedente dar esa interpretación al artículo 1481.''

En el caso de *Succession of Filheil,* 119 La. 998, la corte diferenció el caso de Jahraus con respecto a lo que constituirá una relación secreta entre las partes y declaró que existía un estado de concubinato entre ellas cuando los hechos, dejando a un lado la cuestión de ser notoriamente conocidos, eran muy parecidos a los del presente caso. El razonamiento de la corte en el caso de Jahraus que hemos citado, fué aceptado.

En el caso Jahraus, *supra,* página 49, se cita una autoridad francesa que define el concubinato en un sentido parecido a como se define en dicho caso. En vista de los antecedentes de Puerto Rico y la ley que hemos podido hallar en las jurisdicciones que tienen condiciones parecidas a las de Puerto Rico, no vacilamos en llegar a la conclusión de que cuando un hombre sostiene una casa separada para una mujer por un período de años y va a visitarla, permaneciendo con ella por tres o cuatro días a la vez, semejante relación constituye un estado de concubinato.

Ataca el apelante la sentencia y conclusión general de la corte inferior por existir prejuicio, pero su razonamiento se hace depender principalmente del hecho de que la posición de la corte en cuanto al caso era distinta de la que tuvo el apelante; en otras palabras, se hace depender el hecho relativo al prejuicio en gran parte, de los errores que alegó

el apelante que pueden verse en los autos. Para estar de acuerdo con el apelante sería necesario aceptar la teoría que él sustenta respecto al caso y declarar que los demandantes no estuvieron justificados al establecer su acción, pero del examen que hemos hecho de los autos en su totalidad estamos convencidos de lo contrario; y siendo ello así, claro es que opinamos que debe confirmarse la sentencia apelada.

*Confirmada la sentencia apelada.*

Jueces concurrentes: Sres. Presidente Hernández y Asociados del Toro, Aldrey y Hutchison.

———

Habiéndose presentado con posterioridad una moción de reconsideración de sentencia, el tribunal por su Juez Asociado Sr. Wolf, emitió la siguiente opinión:

Se ha presentado una moción de reconsideración en la que se alegan varias razones para fundamentarla. Es evidente que este tribunal incurrió en un error en el uso de una palabra en una parte de su opinión. Dijimos al considerar la Excepción Décima, que la corte inferior no cometió error alguno al negarse a admitir una carta que fué escrita por Víctor Martínez a su esposa en la que manifestaba que su único hijo legítimo era Víctor P. Martínez. El uso de la palabra "legítimo" fué un desliz de la pluma. Es evidente que el propósito del demandado, como lo revela la carta, fué demostrar que él era el "único hijo" y no el "único hijo legítimo." La carta, sin embargo, no era sino a manera de una declaración en su propio interés (*self-serving declaration*), ni menos que *res inter alios acta* y prácticamente sin ninguna fuerza probatoria. La única carta a que se refería la Excepción Décima fué la dirigida a la esposa de Víctor Martínez y no a una carta escrita al *Royal Bank of Canada*. Pero una carta escrita al banco quedaría sujeta a objeciones parecidas.

Con respecto a la prueba de que los demandantes eran los hijos de Cecilia Méndez y nacieron en las fechas expresadas,

nada tenemos que añadir al razonamiento que aparece en la opinión; ni nada tenemos que agregar acerca de la fuerza probatoria de las cartas que fueron admitidas como prueba.

En cuanto al interés de los testigos o a la contradicción en la prueba, esa era una cuestión que incumbía a la corte inferior con la cual no intervendrá este tribunal excepto en un caso extraordinario y cuando esté convencido de que ha habido error o mediado algún otro elemento.

Si la sentencia de la corte inferior dependió únicamente del reconocimiento voluntario de Víctor Martínez de los supuestos hijos naturales, simpatizaríamos mucho con la actitud del demandado, pero la sentencia de este tribunal se basa específicamente en el hecho de que la prueba tendía a demostrar un estado de concubinato que existe entre Víctor Martínez y Cecilia Méndez y que los hijos nacieron mientras duró ese estado.   Es innecesario, por tanto, probar nada más sino que a la fecha del nacimiento de cada uno de estos hijos existía dicho estado de concubinato; y la prueba en realidad tendía a mostrar un estado de concubinato que comienza antes y se extiende hasta una fecha posterior al nacimiento de cualquiera de los hijos en este caso.

Debe desestimarse la moción.

*Denegada la reconsideración.*

Jueces concurrentes: Sres. Presidente Hernández y Asociados del Toro, Aldrey y Hutchison.